UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **RICHARDS CLEARVIEW, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1709** |
| **BED BATH & BEYOND, INC.** | **SECTION "L" (4)** |

### FINDINGS OF FACT & CONCLUSIONS OF LAW

This case involves a commercial eviction proceeding initiated in the 24th Judicial District Court for the Parish of Jefferson by Plaintiff Richards Clearview, L.L.C., ("Landlord") the owner of a shopping mall located at 4436 Veterans Memorial Boulevard, Louisiana, against its tenant, Bed Bath & Beyond, Inc. ("BB&B"). BB&B removed the matter to federal court on June 12, 2020, on the basis of diversity jurisdiction. R. Doc. 1.

Landlord seeks eviction of BB&B on the ground that BB&B has allegedly failed to pay amounts due under the lease for April and May 2020, presently totaling $88,974.96, "in a blatant default of its obligations under its lease." R. Doc. 1-1 ¶ 4. On May 5, 2020, Landlord allegedly sent a Notice of Default to BB&B demanding payment of the amounts past-due. *Id.* ¶ 24. Receiving no payments from BB&B, Landlord sent a notice terminating the lease effective May 26, 2020 and demanding that BB&B vacate the premises, which BB&B allegedly ignored. *Id.* ¶¶ 27, 30.

Based on the foregoing factual allegations, Landlord requests that the Court order BB&B to show cause why it should not be evicted and ordered to deliver possession of the premises, and

1

that "this order be set with preference and in an expedited manner because [Plaintiff] is unable to lease the Leased Premises to another tenant." *Id.* ¶ 33.

BB&B answered the complaint on July 8, 2020, generally denying Landlord's allegations and stressing that this situation arises from the unprecedented global outbreak of COVID-19 that has caused serious business interruptions through-out the country. R. Doc. 16. BB&B does not dispute that it failed to pay full rent for April 2020 and any rent for May 2020 in a timely fashion under the Lease Agreement, but argues that it was excused from doing so by Governor John Bel Edwards' Emergency Proclamation 33 ("Emergency Proclamation"), which closed "all malls, except for stores in a mall that have a direct outdoor entrance and exit that provide essential services and products," *id.* ¶ 10, and the Lease's force majeure clause. *Id.* Specifically, BB&B alleges that as a result of the Emergency Proclamation, the BB&B store at issue was closed from March 23 through June 5, 2020, with limited curb-side pick-up beginning on May 1, 2020. *Id.* ¶ 7. BB&B requested a temporary rent reduction and waiver of late fees and interest from Landlord as a result of the closure. *Id.* ¶ 9. Believing that the Lease's force majeure clause excused it from paying rent for the relevant period, BB&B paid partial rent for April, which Landlord accepted, and made no payment for May. *Id.* ¶ 10.

BB&B further alleges that it cured any rental deficiency by paying the residual rent for April and full rent for May and June on June 1, after receiving Landlord's Notice of Default. *Id.* ¶¶ 10, 11. BB&B notes that its attempts to cure were frustrated by Landlord's decision to revoke the standard ACH deposit method that had been used for years by letter dated May 15, 2020. *Id.* ¶ 11. BB&B alleges that Landlord refused payment of the tendered past-due amount on three occasions. *Id.* ¶¶ 13–17.

In its answer, BB&B asserts fourteen affirmative defenses, including failure to state a claim, application of the doctrine of confirmation and/or ratification, the existence of a superseding, intervening, or force majeure event, and the doctrine of unclean hands. *Id*. ¶¶ 1–4. BB&B also raises a counterclaim against Landlord, asking this Court to declare that the COVID-19 pandemic was a force majeure incident under the terms of the Lease, that BB&B has satisfied its obligations under the Lease, and that the Lease remains in full effect.

Landlord thereafter filed a Motion to Maintain a Summary Proceeding, R. Doc. 8, which the Court granted over BB&B's objection, R. Doc. 11, finding that state law affords landlords with certain procedural rights unavailable under the Federal Rules of Civil Procedure and that the Fifth Circuit has sanctioned the adoption of these state procedural laws in similar circumstances, R. Doc. 20. In a status conference held shortly thereafter, the Court set a trial date of August 18, 2020, to consider the narrow issue of whether Landlord is entitled to evict BB&B and reclaim possession of the premises and ordered the parties to file any motions by August 3, 2020.

The matter came before the Court without a jury on August 18, 2020. Due to the ongoing global pandemic of COVID-19, trial was held by Zoom videoconference. The Court has carefully considered the testimony of all witnesses, the exhibits entered into evidence during the trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## I. FINDINGS OF FACT

1. Landlord owns the Clearview Shopping Center (the "Shopping Center") located at 4436 Veterans Memorial Boulevard, Metairie, Louisiana, 70006. R. Doc. 24-2 ¶ 4.

2. On November 14, 2001, Landlord and BB&B entered into a written Lease Agreement (the "Lease") concerning approximately 50,580 square feet of space at the Shopping Center, plus approximately 1,000 additional square feet of mezzanine level office space. The Lease provided for an initial term of fifteen years, with four successive five-year renewal options. R. Doc. 24-2 ¶ 5.

3. In June 2008, Landlord and BB&B entered into a First Amendment to Lease, thereby expanding BB&B's premises on the first floor of the shopping center and making other specific changes. R. Doc. 24-2 ¶ 6; R. Doc. 36-1 at 1.

4. In January 2018, BB&B elected the renew the Lease under the First Renewal Option and renewed the Lease for a five-year term commencing February 1, 2018 and lasting through January 31, 2023. The Lease contains additional options that, if exercised, would extend the term for another fifteen years, through January 31, 2038. R. Doc. 32 at 1–2.

5. Normally, the Lease obligates BB&B to pay "Fixed Rent" in the amount of $600,669.00 per year, in successive monthly installments, plus BB&B's share of Real Estate Taxes, Common Area Charges, and Insurance Costs in the monthly amount of $16,666.67, and percentage rent based on BB&B's sales. R. Doc. 36 at 5, 16; R. Doc. 36-1 at 2. Where applicable, Fixed Rent is due on the first day of the calendar month to which it applies. R. Doc. 36 at 16. BB&B's monthly obligation amounts to $66,722.24. R. Doc. 24-2 ¶ 12.

6. In certain situations, BB&B's obligation to pay Fixed Rent converts into an obligation to pay Alternate Rent. The Lease defines Alternate Rent as: "Payment of three percent (3%) of all Gross Sales (as hereinafter defined in Section 4.4.2), not to exceed the amount of Fixed Rent which otherwise would have been payable during such period." R. Doc. 36 at 5. Alternate Rent, where applicable, is due within thirty days after the end of the calendar month to which it

applies. R. Doc. 36 at 5. If Alternate Rent for a particular month does not exceed the Fixed Rent that would otherwise have been due during the same period, payment thereof must be "accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" achieved during, and the amount of Alternate Rent payable for, such month. R. Doc. 36 at 5.

7. The Lease contains an "On-Going Co-Tenancy" clause, which provides that Alternate Rent is due when there is an "Excess Vacancy" at the Shopping Center. An Excess Vacancy exists when "there are fewer than two (2) national or regional tenants of the type typically found in first-class regional shopping centers located in the greater New Orleans metropolitan area" that are each (1) open for business in the Shopping Center and (2) occupying more than 50,000 square feet of floor space. R. Doc. 36 at 42.

8. At various times over the lifetime of the Lease, Palace Theatre, Target, and Sears constituted "co-tenants" for the purposes of the On-Going Co-Tenancy Clause. R. Doc. 36 at 10.

9. The Lease also provides that if BB&B elects to cease conducting its business in the Shopping Center before the Lease term expires, "BB&B shall pay Landlord Fixed Rent, Tenant's Contribution, Tenant's Pro Rata Share of the increase of Taxes, Common Area Charges, and Landlord's Insurance Costs in accordance with the terms of the Lease, and, in lieu of Percentage Rent as set forth herein, an annual amount equal to the average annual amounts paid by Tenant for Percentage Rent for the immediately preceding two (2) calendar years." R. Doc. 36 at 37.

10. The Lease provides Landlord with the right to audit BB&B's records relating to Gross Sales once per year to investigate whether Percentage Rent has been properly calculated and paid. R. Doc. 36 at 18.

11. The Lease defines BB&B's failure to "pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent," as an "Event of Default." R. Doc. 36 at 38.

12. The Lease also defines BB&B's failure to "perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice from Landlord specifying the nature of such default," as an "Event of Default." R. Doc. 36 at 38.

13. The Lease provides that where notice is due, notice "shall be effective upon receipt (or refusal of receipt) at the address of the addressee." R. Doc. 36 at 41.

14. The Lease contains a force majeure clause under which the failure to perform an act required by the Lease may be excused for the period of the delay in the event that performance is hindered by "strikes, failures of power, riots, insurrection, war, earthquake, hurricane or tornado . . . or other reasons of a like nature which are beyond the reasonable control of the party." R. Doc. 36 at 42.

15. In spring 2017, Landlord hired Joseph Reagan, CPA, of the firm Reagan & Reagan, to conduct an audit of BB&B's gross sales from 2017 and 2018 for the purposes of verifying percentage rent calculations. R. Doc. 36-15 at 4. The audit took place on April 17, 2019 at BB&B's corporate headquarters in Union, New Jersey. On April 1, 2019, Nicole Sandoval, a Real Estate Accountant for BB&B, provided Mr. Reagan with a list of documents that would be available to him during the audit. R. Doc. 37-20. During the audit, Mr. Reagan and Ms. Sandoval communicated via email about certain questions Mr. Reagan had. R. Doc. 37-21.

16. Based on the documents provided by BB&B and conversations Mr. Reagan had with Ms. Sandoval and Mrs. Zaborowski, Director of Real Estate Accounting, Mr. Reagan reported to

Landlord that he was unable to validate the numbers reported by BB&B on its percentage rent worksheets, monthly sales reports, POS sales reports, or general ledger. R. Doc. 36-16.

17. Neither Mr. Reagan nor Landlord requested any information from BB&B after the audit was completed. Direct examination of Joseph Reagan, CPA, August 18, 2020, 11:15 a.m.

18. On March 11, 2020, Governor John Bel Edwards issued Emergency Proclamation Number 25 JBE 2020, declaring a statewide public health emergency in the state of Louisiana due to the ongoing global outbreak of COVID-19. R. Doc. 37-2.

19. On March 16, 2020, Governor John Bel Edwards issued Emergency Proclamation Number JBE 2020–30, closing all movie theatres, among other types of businesses, until April 12, 2020. R. Doc. 37-3.

20. As a result of the Governor's order, the Palace Theatre located in the Shopping Center closed to the public. Direct examination of Peter Russell, August 18, 2020, 11:32 a.m. At the time of the closure, Sears had gone out of business and its premises at the Shopping Center were vacant. Direct examination of Peter Russell, August 18, 2020 11:32 a.m.

21. On March 22, 2020, Governor John Bel Edwards issued Emergency Proclamation Number 33 JBE 2020, closing to the public "[a]ll malls, except for stores in a mall that have a direct outdoor entrance and exits that provide essential services and products as provided by CISA guidelines." R. Doc. 37-4.

22. On March 23, 2020, the BB&B store at the Shopping Center closed to the public. The store remained closed until June 5, 2020, although limited curb-side pick-up began on May 1, 2020. R. Doc. 16 ¶ 7. At all relevant times, the BB&B store had a direct outdoor entrance and exit and sold several essential products such as first aid equipment, soap, and hand sanitizer. Trial Testimony; R. Doc. 36-25.

23. On April 1, 2020, BB&B paid Landlord $44,469.88 in rent. R. Doc. 24-2 ¶ 12.

24. On April 30, 2020, Governor John Bel Edwards issued Emergency Proclamation Number 52 JBE 2020, ordering the continued closure of movie theatres and malls, among other types of businesses and establishments, through May 15, 2020. R. Doc. 37-5.

25. On May 1, 2020, BB&B did not remit any rent payment to Landlord. R. Doc. 24-2 ¶ 22.

26. On May 5, 2020, Landlord sent Emily Ortiz, BB&B's Lease Administrator, a Notice of Default in the manner required by the Lease's notice provisions, indicating that BB&B was in default of its obligations under the Lease due to its failure to pay full rent for the months of April and May, 2020, and its failure to provide certain documents requested in connection with an audit performed by Reagan & Reagan, CPA for the years 2017 and 2018. R. Doc. 37-14. The letter was sent by Federal Express and signed for by a J. Zadoff on May 8, 2020. R. Doc. 36-4 at 7.

27. The Notice of Default was also sent to Allan Rauch, Esq., c/o Bed Bath & Beyond, and Bart I. Mellits, Esq., Ballard Spahr Andrews & Ingersoll, LLP. R. Doc. 36-5. At the time the Notice was sent, neither Allan Rauch nor Bart Mellits worked for Bed Bath & Beyond. Direct examination of Peter Russell, August 18, 2020, 11:37 – 11:39 a.m. Further, at the time the Notice was sent, BB&B's corporate headquarters was closed due to the COVID-19 pandemic and its office employees were working from their homes. Its mail was directed to its warehouse.

28. Mr. Zadoff was an employee who worked in the BB&B warehouse behind its corporate headquarters in Union, New Jersey. Direct examination of Peter Russell, August 18, 2020, 11:40 a.m.

29. On May 15, 2020, Landlord informed BB&B that it would no longer accept rent payments made through ACH deposit, and that all rents would henceforth have to be mailed to Landlord's mailing address. R. Doc. 37-16.

30. On May 19, 2020, Landlord informed BB&B that it intended to terminate the Lease effective May 26, 2020 at midnight, pursuant to Section 16.1.2 of the Lease, and warning that Landlord would initiate summary proceedings in the event of BB&B's non-compliance. R. Doc. 36-5.

31. On May 26, 2020, Landlord filed the instant Rule for Possession of Premises and Eviction in the 24th Judicial District Court for the Parish of Jefferson, Louisiana. R. Doc. 1-1.

32. On May 28, 2020, BB&B sent Landlord a check, dated June 1, 2020, in the amount of $155,697.38, which was the total amount of rent claimed by Landlord. R. Doc. 37-14 at 6. On June 2, 2020, Landlord's counsel sent BB&B a letter indicating that tender of payment had been refused. R. Doc. 37-17. On June 11, 2020, BB&B issued a check to Landlord in the amount of $1,248.03 for April, May, and June interest payments. R. Doc. 37-14 at 7. On June 12, 2020, Landlord's counsel sent BB&B a letter indicating that tender of payment had again been refused. R. Doc. 37-18.

33. On January 12, 2020, BB&B removed this matter to federal court.

## II. CONCLUSIONS OF LAW

34. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). Venue is appropriate in the Eastern District of Louisiana.

35. A federal court sitting in diversity must apply the substantive law of the state in which it sits. *See Erie v. Tompkins*, 304 U.S. 64, 71–77, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, the Court applies Louisiana law to this contractual dispute.

36. This case involves the interpretation of the Lease Agreement entered into by Landlord and BB&B on November 14, 2001. R. Doc. 36. "The lease contract itself is the law between the parties; it defines their respective rights and obligations so long as the agreement does not affect the rights of others and is not contrary to the public good." *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96), 702 So. 2d 648, 666, on reh'g (Nov. 3, 1997). Under Louisiana law, "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. The court must first look to the language of the contract to deduce common intent and give the contract's words their generally prevailing meaning. *Id.* art 2047.

37. "Louisiana jurisprudence does not favor lease cancellation." *Walker v. Chesapeake Louisiana, L.P.*, 440 F. App'x 254, 256 (5th Cir. 2011). Accordingly, "Louisiana courts are vested with discretion under certain circumstances to decline to grant a lessor cancellation of a lease although such right appears to be available to him.'" *Ergon, Inc. v. Allen*, 593 So.2d 438, 440 (La. App. 2 Cir. 1992). This discretion is known as judicial control, and whether it is appropriate "depends on the 'circumstances.'" *Walker*, 440 Fed. App'x 254. "Judicial control is an equitable doctrine by which the courts will deny cancellation of the lease when the lessee's breach is of minor importance, is caused by no fault of his own, or is based on a good faith mistake of fact." *W. Sizzlin Corp. v. Greenway*, 36,088 (La. App. 2 Cir. 6/12/02), 821 So. 2d 594, 601. Typically, lease cancellation is justified only where the lessee's "dereliction of duty [is] of a substantial nature and cause injury to the lessor." *Simmons v. Pure Oil Co.*, 124 So.2d 161, 166 (La. Ct. App. 1960), *aff'd*, 241 La. 592, 129 So.2d 786 (1961).

38. Landlord has identified two alleged derelictions of duty—the failure to provide certain documents regarding a gross sales audit in April 2019 and the failure to pay Fixed Rent for April and May 2020. The first does not constitute a dereliction of duty on BB&B's behalf.

Although there is evidence that Mr. Reagan, Landlord's CPA, was not able to validate to his satisfaction BB&B's reported Gross Sales from 2017 and 2018, there is no evidence that Landlord attempted to address the issue at the appropriate time by allowing BB&B to supply additional documents.[1] Indeed, the evidence reveals that the first time the alleged deficiency was brought to BB&B's attention was in the May 5, 2020 Notice of Default, to which BB&B responded on June 15, 2020, asking for clarification about the allegations and inviting the auditor to conduct a second audit. R. Doc. 37-22. Although the failure to provide certain documents may have frustrated Landlord's audit process, nothing about BB&B's conduct indicates that it breached its obligations under the Lease, let alone did so in bad faith or in a manner that caused Landlord any harm. Accordingly, this alleged failure to provide audit-related documents does not constitute an Event of Default under the Lease.

39. Whether BB&B breached the Lease by failing to pay Fixed Rent for April and May 2020, is a more complicated question susceptible to reasonable arguments on both sides. The answer first depends on whether BB&B was obligated to pay Fixed or Alternate Rent.

40. It is undisputed that BB&B paid partial rent on April 1, 2020 and no rent on May 1, 2020; accordingly, if Fixed Rent was due at that time, BB&B did not satisfy its obligation under the Lease. If, on the other hand, Alternate Rent was due at that time, BB&B fully satisfied its obligation under the Lease. Alternate Rent is applicable if there is an Excess Vacancy at the Shopping Center, meaning that there are fewer than two national or regional tenants of the type typically found in first-class shopping centers that are each open for business and occupying more than 50,000 square feet of floor space.

---

[1] There is conflict in the testimony of Mr. Reagan and Ms. Sandoval, a BB&B employee, as to whether certain documents, such as bank statements, were provided during the audit. Direct examination of Nicole Sandoval, August 18, 2020, 1:49 p.m.; Direct examination of Joseph Reagan, August 18, 2020, 10:50 a.m.

41. It is undisputed that the Palace Theatre closed to the public on March 17, 2020 and that Sears had gone out of business, leaving BB&B and Target as the only tenants in the Shopping Center fitting the Co-Tenancy Clause's description during the months of April and May 2020. However, the contract is ambiguous as to whether BB&B constitutes a "co-tenant" for the purposes of the On-Going Co-Tenancy Clause, and the Court concludes that the parties could not have intended for this to be the case. The purpose of the clause is clearly to induce BB&B to establish itself in the Shopping Center by ensuring that there exist on the premises high-qualities businesses that will generate sufficient foot traffic. Clearly, BB&B cannot be a co-tenant with itself, nor can it induce itself to operate in the Shopping Center. Moreover, Mr. Russell, the Managing Director of Real Estate, negotiated the Lease and testified that the parties did not intend for BB&B to constitute a "co-tenant" for the purposes of determining whether an Excess Vacancy existed. Direct examination of Peter Russell, August 18, 2020, 11:25 a.m. – 11:30 a.m. Accordingly, there was an Excess Vacancy as of March 17, 2020.

42. Although an Excess Vacancy existed as of March 17, 2020, there is a reasonable dispute as to whether BB&B was obligated to pay Alternate Rent or Fixed Rent under the Lease's voluntary closure provision. Specifically, the Lease provides that if BB&B voluntarily ceases to operate on the premises, it is obligated to continue paying Fixed Rent, in addition to taxes, common area charges, and insurance costs ("Closure Rent"). Although Governor John Bel Edwards' March 22, 2020 Emergency Proclamation mandated the closure of "[a]ll malls," the BB&B store at issue fell under the exception for "stores in a mall that have a direct outdoor entrance and exist that provide essential services and products as provided by CISA guidelines." Accordingly, BB&B's closure from March 23, 2020 through June 5, 2020, while prudent and precautionary, was voluntary since they were excluded from the closure mandate. The question

is thus whether BB&B's obligation to pay Closure Rent, because it voluntarily closed the store, or Alternate Rent, because an Excess Vacancy existed. The contract is unclear on this issue. However, heeding the duty to interpret a contract's terms "in light of the contract's other provisions in order to give each provision the meaning suggested by the contract as a whole," *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 443 (5th Cir. 2002), a good argument can be made for BB&B's obligation to pay Closure Rent.

43. Assuming, without deciding, that Closure Rent was due on April 1, 2020 and May 1, 2020, this does not necessarily compel the conclusion that BB&B breached its obligation under the Lease. Notably, an Event of Default with respect to non-payment occurs only if BB&B fails to pay full rent "within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent." R. Doc. 36 at 38. Landlord's Notice of Default was received by a BB&B warehouse employee on May 8, 2020, although it was not until May 20, 2020 that anyone with the authority to act on the Notice received it. However, the Lease is clear on this issue: notice is "effective upon receipt (or refusal of receipt) at the address of the addressee." R. Doc. 36 at 41. BB&B's cure, therefore, was due by May 18, 2020, and its May 28, 2020 payment of all allegedly outstanding rent was accordingly untimely.

44. Again assuming, without deciding, that Closure Rent was due and that BB&B's failed to cure the deficiency by May 18, 2020, this does not automatically warrant lease termination and eviction. Under Louisiana law, these events must be considered in the context of the circumstances that existed at the time. Here, the totality of the circumstances warrants the discretionary exercise of judicial control. *See KM, Inc. v. Weil Cleaners, Inc.*, 50,209 (La. App. 2 Cir. 1/13/16), 185 So. 3d 112, 118 ("Louisiana law is clear that the dissolution of a lease for nonpayment of rent is subject to judicial control according to the circumstances.").

45. As an initial matter, there is sufficient ambiguity in the contract to justify both Landlord's position—that Fixed Rent was due and the Lease breached—and BB&B's position—that Alternate Rent was due and the Lease not breached. Although Landlord attempted at trial to demonstrate that BB&B's Alternate Rent argument is a post-hoc attempt to justify its actions, the Court is concerned only with whether BB&B breached its obligation under the Lease in a manner that entitled Landlord to reclaim possession of the premises.

46. Further, BB&B attempted to remedy its deficiency without inordinate delay. *See Ergon, Inc.*, 593 So. 2d at 440 (applying judicial control where the lessee had "attempt[ed] in good faith to correct its mistake by tendering the rent immediately when notified of its delinquency"). BB&B's tender of payment occurred on May 28, 2020, ten days after the cure period expired. Although Landlord may have desired more prompt attention, the delay is reasonable in light of the fact that notice was received at the height of an ongoing global pandemic that forced BB&B to shut its headquarters and operate the business remotely in light of New Jersey's "shelter in place" mandate. Furthermore, the Notice of Default was received not by a corporate employee but by a warehouse employee without authorization to act on it. Despite the delay between the receipt of the Notice by the warehouse employee and its receipt by the appropriate department, BB&B acted expeditiously in responding to the notice by sending out a check in the full amount allegedly past due at most eight days later. It is also significant to note that this is the first time in almost nineteen years that BB&B was late in a rent payment. Direct examination of Thomas Richards, August 18, 2020, 9:26 a.m.

  Furthermore, any delay in payment is at least partially attributable to Landlord himself, who on May 15, 2020 revoked the standard ACH deposit method of rent payment, which allows for an instant transfer of funds from bank account to bank account, and instead

required a paper check mailed to Landlord's address, a process that understandably increased the length of the delay. R. Doc. 37-16. While it is true that many courts exercising judicial control have highlighted the expedient nature of the tenant's remedy, the understandable confusion caused by the pandemic and Landlord's own actions sufficiently excuses the eight-day delay in this matter when considering the totality of the circumstances. *Cf. Tales IP, LLC v. Common-Camp, LLC*, 2019 WL 5785092, at *3 (E.D. La. 11/6/2019) (applying judicial control where lessee had withheld rent mistakenly but in good faith and deposited the disputed amount in the registry of the court after receiving notice of default).

47. Moreover, Landlord has not demonstrated any evidence that it has suffered any harm as a result of BB&B's eight-day delay. *See Simmons v. Pure Oil Co.*, 124 So.2d at 166 (explaining that lease cancelation requires a showing of harm). Although $88,974.96—the amount allegedly outstanding—is certainly a large sum, BB&B has on multiple occasions attempted to pay Landlord every cent it allegedly owes under the Lease, in addition to interest. As noted above, this tender was first made some ten days after its cure date, in the midst of an unprecedented pandemic that has significantly frustrated BB&B's normal operations. Additionally, any harm Landlord has suffered by the belated payment is outweighed by the serious harm Lease cancellation would cause BB&B's sixty-five employees who would lose their jobs in an uncertain economy and the local community who depend on BB&B for essential needs in this ongoing pandemic. *See Little Bel, LLC v. Center Point Energy, Inc.*, 838 F. Supp. 2d 522, 530 (W.D. La. Jan 4, 2012) (weighing the relative harm the parties would suffer as a result of lease cancelation).

48. In sum, the Court concludes that the exercise of judicial control is warranted in this case because BB&B had a plausible basis for believing that Fixed Rent was not due, and that even

if BB&B was mistaken, it attempted to remedy the default relatively shortly after receiving notice thereof. Although the cure did not comply with the applicable deadlines in the Lease, any deficiency in that regard is excusable by the global circumstances. Moreover, there is no evidence that Landlord was harmed by the delay in any way, let alone a substantial one. In sum, lease cancellation, a disfavored event under Louisiana law, is not appropriate here.

### III. SUMMARY

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that BB&B should not be evicted from the Lease Premises and ordered to deliver possession of same to Landlord at this time.

New Orleans, Louisiana this 2nd day of September 2020.

_____
Eldon E. Fallon
United States District Judge